UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SCOTT POISSON,              )
                            )
        Plaintiff           )
                            )
v.                          )   No. 2:11-cv-245-NT
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
                            )
        Defendant           )

### REPORT AND RECOMMENDED DECISION[1]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the commissioner supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. I recommend that the decision of the commissioner be vacated, and the case remanded for further development.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 405.101 (incorporating 20 C.F.R. §§ 404.1520, 416.920); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had severe impairments of a herniated disc at L5-S1 (status-post a motor vehicle accident), right knee crepitus, and a herniated disc at C5-6, Finding 3, Record at 13; that he retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he was able to lift and/or carry up to 15 pounds

---

[1] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted his administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on March 16, 2012, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

frequently and up to 20 pounds occasionally, could frequently climb ramps and stairs, could occasionally balance, stoop, crouch, crawl, or kneel, could not climb ladders, ropes, or scaffolds, and could sit, stand, and walk up to six to eight hours in an eight-hour workday, Finding 5, *id.* at 14; that, considering his age (23 years old, defined as a younger individual, on the alleged disability onset date), education (at least high school), work experience (transferability of job skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that he could perform, Findings 7-10, *id.* at 19; and that he, therefore, was not disabled from June 18, 2002, through February 25, 2011, the date of the decision, Finding 11, *id.* at 20.[2] The Decision Review Board selected the decision for review but failed to act within 90 days, *id.* at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. § 405.420(a)(2); *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform

---

[2] The plaintiff was insured for purposes of SSD benefits through December 31, 2011. *See* Finding 1, Record at 12. The administrative law judge mistakenly referred to June 18, 2002, the plaintiff's original alleged onset date of disability, rather than January 31, 2009, his amended alleged onset date. *See id.* at 10. Nothing turns on the error.

2

work other than his past relevant work. 20 C.F.R. § 405.101 (incorporating 20 C.F.R. §§ 404.1520(g), 416.920(g)); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I. Discussion

The plaintiff seeks reversal and remand on the basis that the administrative law judge's Step 5 finding is unsupported by substantial evidence because it hinges on a flawed RFC determination as well as flawed vocational expert testimony. *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (Docket No. 12) at 5-14. I agree, and recommend that the court find, that an error in the determination of RFC justifies reversal and remand.

### A. Asserted Flaws in RFC Determination

#### 1. Evidence of Record

The record contains the following conflicting assessments of the plaintiff's RFC:

1. A June 2, 2009, report by Disability Determination Services ("DDS") examining consultant Robert N. Phelps, Jr., M.D., deeming the plaintiff capable of lifting/carrying 10 pounds, standing or walking for at least two hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, with a need to alternate sitting and standing periodically to relieve pain/discomfort, moderately limited in his ability to push or pull with his upper and lower extremities, rarely able to bend, climb, balance, stoop, kneel, crouch, or crawl, markedly limited in reaching and feeling, and mildly limited in handling and fingering. *See* Record at 315;

2. A July 7, 2009, opinion of DDS nonexamining consultant J.H. Hall, M.D., affirmed on July 13, 2009, by DDS nonexamining consultant Harris C. Faigel, M.D., that the

plaintiff could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday, had no limits on pushing/pulling or manipulation, could frequently climb ramps/stairs and ladders, ropes, or scaffolds, could frequently balance, kneel, and crawl, and could only occasionally stoop or crouch. *See id.* at 319-28;

3. A December 31, 2009, opinion of DDS nonexamining consultant Richard T. Chamberlin, M.D., that the plaintiff could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, had no limits on pushing/pulling or manipulation, could frequently climb ramps/stairs, could never climb ladders, ropes, or scaffolds, and could only occasionally balance, stoop, kneel, crouch, or crawl. *See id.* at 342-48; and

4. A December 14, 2010, opinion of treating orthopedic surgeon Frank Graf, M.D., that the plaintiff could lift/carry less than 10 pounds, stand or walk for less than two hours in an eight-hour workday with the assistance of a cane for ambulation, and sit for less than six hours in an eight-hour workday, periodically alternating sitting and standing to relieve discomfort, could never climb, balance, kneel, or crawl, could occasionally crouch or stoop, could occasionally reach, handle, finger, and feel, and required limited exposure to dust, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, and gases. *See id.* at 396-99.

The administrative law judge attributed little weight to Dr. Graf's RFC opinion, or a series of opinions commencing in 2003 that the plaintiff was disabled, because (i) Dr. Graf had opined that the plaintiff could not work even when the plaintiff was working at the substantial gainful activity level in 2007 and 2008, (ii) Dr. Graf's treatment notes did not support his

continuing medical opinion that the plaintiff could not work, and (iii) Dr. Graf had coincidentally opined one month prior to the plaintiff's hearing that his condition was worse. *See id*. at 17-18.

The administrative law judge attributed little weight to Dr. Phelps' RFC opinion because it was not supported by the medical evidence of record. *See id*. at 18. She observed that Dr. Phelps indicated that the plaintiff's ability to handle objects was markedly limited despite noting that his hands were somewhat dirty and callused and finding, on examination, normal hand motion and dexterity, with the plaintiff able to pick up small objects, turn a doorknob, hold a glass, and button and tie. *See id*. She added that Dr. Phelps recorded a normal neurological examination with no muscle atrophy and normal range of motion except in the plaintiff's neck. *See id*.

The administrative law judge gave little weight to the opinions of Drs. Hall and Faigel because "evidence received at the hearing level is more consistent with a light exertional capacity and more restricted postural limitations." *Id*. (citation omitted). She attributed some weight to Dr. Chamberlin's opinion, to the extent that it was consistent with the RFC that she found, but explained that "evidence received at the hearing level is more consistent with a light exertional capacity." *Id*.

The plaintiff faults the administrative law judge for (i) crafting an RFC based in part on her own lay interpretation of the medical evidence and/or speculation as to the weight of an infant child whom the plaintiff sometimes could hold, (ii) rejecting, without adequate analysis or good reason, the opinions of the only two medical specialists who had actually examined the plaintiff and had arrived at consistent RFC findings, and (iii) improperly relying in part on the opinion of Dr. Chamberlin, who did not have the benefit of review of later submitted material evidence. *See* Statement of Errors at 7-12. I agree that the administrative law judge's

determination of the plaintiff's lifting/carrying capacity is unsupported by substantial evidence, warranting reversal and remand. However, the remainder of the plaintiff's RFC challenges fall short.

## 2. Winning Point: Lifting/Carrying Capacity

The administrative law judge adopted the RFC determination of Dr. Chamberlin with one deviation: she found the plaintiff capable of lifting/carrying up to 15 pounds frequently and up to 20 pounds occasionally, whereas Dr. Chamberlin had considered him capable of lifting/carrying up to 25 pounds frequently and up to 50 pounds occasionally. *Compare* Finding 5, Record at 14 *with id*. at 342-45. She explained that the deviation was premised on "evidence received at the hearing level" that was "more consistent with a light exertional capacity." *Id*. at 18.

It is unclear what evidence the administrative law judge meant. At oral argument, counsel for the plaintiff asserted that it had to have been Dr. Graf's 2010 evidence that the plaintiff could lift/carry less than 10 pounds, the administrative law judge having rejected the testimony of the plaintiff and his wife that he was unable to lift and carry his seven-month-old baby. *See id*. at 15-16. Counsel for the commissioner rejoined that the administrative law judge simply gave the plaintiff "the benefit of the doubt" in rejecting that portion of Dr. Chamberlin's opinion finding a greater lifting capacity.

I decline to find that the administrative law judge gave the plaintiff the benefit of the doubt. She did not say that she did. To the contrary, she referenced "evidence received at the hearing level[.]" *Id*. at 18. As in *Staples v. Astrue*, Civil No. 09-440-P-S, 2010 WL 2680527 (D. Me. June 29, 2010) (rec. dec., *aff'd* July 19, 2010), this is not a case "in which the administrative law judge can be said simply to have given the claimant the benefit of the doubt." *Staples*, 2010 WL 2680527, at *6. "In *MacFarlane* [*v. Astrue*, No. 07-132-P-H, 2008 WL 660225 (D. Me.

Mar. 5, 2008) (rec. dec., *aff'd* Apr. 1, 2008)]*,* the administrative law judge made clear that he was doing just that." *Id*. (citation omitted). "In this case, by contrast, the administrative law judge affirmatively stated that she found the plaintiff to have suffered from a severe mental impairment prior to his date last insured and that she gave the DDS opinions weight only to the extent that they reflected that he did suffer from a medically determinable mental impairment prior to that date." *Id*. (citation omitted). "Having made that determination, she was obliged to make an RFC determination, rooted in substantial evidence of record." *Id*.

The administrative law judge made a lifting/carrying capacity determination that purportedly was based on evidence, but is not supported by any evidence of record. The error, thus, is not harmless. To the extent that the administrative law judge was influenced, *sub rosa,* by the hearing-level evidence submitted by Dr. Graf, the lifting/carrying capacity found by Dr. Graf would have precluded the jobs that the vocational expert testified that the plaintiff could perform. *Compare* Record at 396 (opinion of Dr. Graf that plaintiff capable of lifting/carrying less than 10 pounds) *with Dictionary of Occupational Titles* (U.S. Dep't of Labor, 4th ed. rev. 1991) ("DOT") §§ 295.367-026 (storage-facility rental clerk, requiring capacity to exert up to 20 pounds of force occasionally and up to 10 pounds frequently to move objects), 211.467-030 (ticket seller, requiring same capacity), 211.462-010 (cashier II, requiring same capacity).

### 3. Remaining Points re: RFC

For the reasons that follow, I determine that the plaintiff's remaining points of error concerning the determination of RFC do not independently warrant reversal and remand.

At oral argument, the plaintiff's counsel contended that, although the administrative law judge's findings regarding the plaintiff's capacity to stand/walk and manipulate objects are consistent with those of Dr. Chamberlin, the Chamberlin report could not stand as substantial

evidence with respect to those capacities because Dr. Chamberlin (i) did not see later-submitted evidence from Dr. Graf, (ii) did not make allowances for an intervening accident in which the plaintiff was involved, and (iii) did not explain why he thought Drs. Phelps and Graf were wrong in assessing greater limitations. The plaintiff's counsel contended that, in these circumstances, the opinion of Dr. Chamberlin, a nonexamining generalist, could not permissibly be found to outweigh the opinions of Drs. Phelps and Graf, examining or treating orthopedic specialists. He further argued that the administrative law judge failed to (i) supply the requisite good reasons for rejecting the RFC opinion of Dr. Graf, a treating source, and/or (ii) recontact Dr. Graf to clarify inconsistencies between his RFC opinion and other evidence of record – inconsistencies that, he argued, the commissioner has now clarified through newly revised rules trigger the duty to recontact.

The administrative law judge's asserted failure to recontact Dr. Graf was not raised in the plaintiff's statement of errors and, hence, is waived. *See, e.g., Farrin v. Barnhart,* No. 05-144-P-H, 2006 WL 549376, at *5 (D. Me. Mar. 6, 2006) (rec. dec., *aff'd* Mar. 28, 2006) ("Counsel for the plaintiff in this case and the Social Security bar generally are hereby placed on notice that in the future, issues or claims not raised in the itemized statement of errors required by this court's Local Rule 16.3(a) will be considered waived and will not be addressed by this court.") (footnote omitted).[3] In any event, the newly-finalized rules that the plaintiff's counsel cited in support of that point took effect on March 26, 2012. *See* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23, 2012) (final rule). The plaintiff's counsel did not explain why they should retroactively have any bearing on the instant case.

---

[3] At oral argument, the plaintiff's counsel noted that the statement of errors cites *Soto-Cedeño v. Astrue*, 380 Fed. Appx. 1 (1st Cir. 2010), which bears on the duty to recontact. However, the plaintiff cited *Soto-Cedeño* for a different proposition, *see* Statement of Errors at 11-12, failing to put the court or the commissioner on notice of any issue regarding a necessity to recontact Dr. Graf.

Turning to the remaining points, it is true, as a general proposition, that opinions of examining sources, and of specialists, are entitled to more weight than those of nonexamining sources or generalists. *See* 20 C.F.R. §§ 404.1527(d)(1) & (5), 416.927(d)(1) & (5). Nonetheless, these are but two of several factors relevant to evaluation of a medical source's opinion, *see id*. §§ 404.1527(d), 416.927(d), and the First Circuit has made clear that the opinions of nonexamining experts can stand as substantial evidence in support of an administrative law judge's finding, *see, e.g., Rose v. Shalala,* 34 F.3d 13, 18 (1st Cir. 1994) ("[T]he amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert. In some cases, written reports submitted by non-testifying, non-examining physicians cannot alone constitute substantial evidence, although this is not an ironclad rule.") (citations and internal quotation marks omitted).

To understand the plaintiff's remaining arguments concerning RFC, it is necessary to place them in context. The automobile accident to which the plaintiff's counsel referred at oral argument occurred on June 18, 2002. *See, e.g*., Record at 312. In the wake of that accident, the plaintiff was treated, *inter alia*, by Dr. Graf, an orthopedic specialist. *See, e.g., id*. at 311, 382-85. The plaintiff originally claimed June 18, 2002, as his alleged onset date of disability, but amended that date at hearing to January 31, 2009, to reflect the fact that he returned to work at a substantial gainful activity level for several of the years following the automobile accident, until he sustained what he described as a work-related injury on January 31, 2009. *See, e.g., id*. at 10, 26, 28, 37; *see also id*. at 154 (earnings report showing that plaintiff earned $3,400.95 in 2005, $5,884.47 in 2006, $13,080.02 in 2007, $25,003.68 in 2008, and $2,089.75 in 2009).

As the administrative law judge noted, *see id*. at 15, the plaintiff sought virtually no medical treatment in the wake of the January 31, 2009 workplace injury, *see id*. at 330-31, 391-92, 412-18 (documenting visits to Dr. Graf on July 29, 2009, August 26, 2009, and December 14, 2010, and to Joseph Wolfson, M.D., on June 24, 2009, July 13, 2009, and September 16, 2009, during none of which plaintiff mentioned the January 31, 2009, work injury and during which rheumatoid arthritis was ruled out as a cause of plaintiff's increased symptoms, including hand/wrist pain, other possible causes were considered but not definitively diagnosed, and Dr. Graf prescribed a cane).

From all that appears, Dr. Chamberlin had the benefit of review of the full record save for Dr. Graf's (i) progress note of a December 14, 2010, visit, (ii) prescription on that date of a cane for the plaintiff, (iii) letter of that date to the plaintiff's attorney, and (iv) RFC opinion of that date stating, *inter alia*, that the plaintiff required a cane, could stand/walk for only two hours in a workday, and had severe manipulative limitations. *See id*. at 390-92, 396-99. To the extent that Dr. Chamberlin did not see the December 14, 2010, progress note and letter, they are largely cumulative of the July 29, 2009, and August 26, 2009, progress notes that Dr. Chamberlin did see, in which Dr. Graf expressed the opinion that the plaintiff had been disabled from all employment since December 1, 2008, and noted that the plaintiff rated his pain as 10 on a scale of one to 10 and complained variously of pain in his wrists, right knee, neck, upper back, mid back, low back, and right shoulder, with diminished grip strength. *See id.* at 348; *compare id*. at 330-31 *with id*. at 390-91. Although Dr. Chamberlin did not see the Graf RFC opinion, there is no reason to believe that his review of that opinion, which, as discussed below, the administrative law judge supportably declined to adopt, would have altered his assessment.

To the extent that the plaintiff complains that Dr. Chamberlin did not take into account the "intervening accident," he is mistaken. The automobile accident, which Dr. Chamberlin did indeed note, *see id*. at 346, happened more than six years prior to the plaintiff's amended onset date of disability. Dr. Chamberlin did not note the workplace injury, no doubt because the plaintiff did not mention it to his own treating providers, whose records Dr. Chamberlin reviewed. However, as discussed above, Dr. Chamberlin did review records subsequent to the workplace injury in which the plaintiff reported an increase in his symptoms. *See id*. at 347-48. Thus, any error in failing to mention the workplace injury was harmless.

The plaintiff's final attack on the fitness of Dr. Chamberlin's opinion to serve as substantial evidence of his RFC likewise is without merit. Dr. Chamberlin did explain why he rejected Dr. Graf's opinion that the plaintiff had been disabled from all employment since December 1, 2008: because the question of disability is reserved to the commissioner, and because workups in 2009 had failed to disclose a medically determinable impairment causing the complained-of new pain in the plaintiff's hands and wrists. *See id*. at 347; *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (the question of disability is reserved to commissioner); Social Security Ruling 96–7p ("SSR 96–7p"), reprinted in *West's Social Security Reporting Service* Rulings (Supp. 2011) at 133 ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."). Dr. Chamberlin adopted Dr. Hall's rationale for deviating from Dr. Phelps' opinion: that, as of the date of the Phelps examination on June 2, 2009, the plaintiff had not received a medical evaluation in more than three years and his only medications were over the

11

counter, undermining the validity of Dr. Phelps' examination. *See* Record at 324, 347. These were supportable reasons to part ways with the Graf and Phelps opinions.

Nor do I find fault with the administrative law judge's decision to credit the RFC opinion of Dr. Chamberlin, as it bore on the plaintiff's standing/walking and manipulative capacities, over those of the examining consultant, Dr. Phelps, and the treating physician, Dr. Graf. It was the job of the administrative law judge to resolve conflicts in the evidence. *See, e.g., Rodriguez*, 647 F.2d at 222 ("The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts."). She duly considered the opinions of Drs. Phelps and Graf and supplied good reasons for declining to adopt them.

As the administrative law judge noted, Dr. Phelps' opinion was at odds with his own examining notes; for example, while Dr. Phelps found the plaintiff mildly or markedly limited in ability to handle objects, he noted that the plaintiff reported working on his used vehicle, observed that the plaintiff's hands were somewhat dirty and callused, and determined on examination that the plaintiff was able to pick up small objects, turn a doorknob, hold a glass, and button and tie. *See* Record at 18; *see also id.* at 312-13. This constituted a good and adequate reason to decline to adopt Dr. Phelps' opinion. Indeed, Dr. Hall, as well, had found Dr. Phelps' opinion unpersuasive. *See id.* at 323 ("It appears the last medical evaluation [the plaintiff] **received was over 3 years ago**. His only medications are OTC [over the counter]. The earlier records undermine validity of Dr. Phelps' exam.") (emphasis in original).

The administrative law judge likewise supplied the requisite good reasons for declining to credit the RFC opinion of Dr. Graf, a treating source. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (commissioner must "always give good reasons in [his] notice of determination or

decision for the weight [he] give[s] [a claimant's] treating source's opinion"); *see also, e.g.*, Social Security Ruling 96-5p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2011) ("SSR 96-5p"), at 127 (even as to issues reserved to the commissioner, "the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)").

As the administrative law judge observed, *see* Record at 17-18, the weight of Dr. Graf's opinions, including his RFC opinion, was undercut by (i) his ongoing issuance, beginning in 2003, of opinions that the plaintiff was disabled from all work, including during periods when the plaintiff was working at substantial gainful activity level, *compare id*. at 331 (July 29, 2009, opinion of Dr. Graf that the plaintiff had been disabled from all employment since December 1, 2008) *with id*. at 154 (earnings report showing that plaintiff earned $13,080.02 in 2007, $25,003.68 in 2008, and $2,089.75 in 2009), and (ii) the lack of clinical findings in Dr. Graf's treatment notes documenting impairments of a disabling nature or severity, *see, e.g., id*. at 330-31, 391.

For these reasons, the plaintiff's challenges to the administrative law judge's RFC determination, save for that relating to the determination of lifting/carrying capacity, fall short.

### B. Vocational Expert Testimony on Numbers of Jobs

The plaintiff finally seeks reversal and remand on the basis that the vocational expert, on whose testimony the administrative law judge relied, generated numbers of jobs using a computer program whose methodology she did not understand, undermining the reliability of that testimony. *See* Statement of Errors at 12-14.[4]

---

[4] In his statement of errors, the plaintiff also argued that the vocational expert's job numbers represented "aggregate standard occupational classification (SOC) code groupings that bear no relationship to the actual job numbers for the DOT occupations that the VE testified claimant could perform, *i.e.*, ticket seller, cashier II, and storage rental clerk." *(continued on next page)*

The plaintiff contends that the vocational expert's reliance on Job Browser Pro, a software program, was misplaced in that she admitted that she did not know how the program converted aggregate data into specific DOT job occupation numbers and, therefore, she impermissibly relied on an unknown statistical methodology, rather than her knowledge or experience, as the basis for her testimony. *See id.* at 13.

This point is without merit. The vocational expert acknowledged that she did not know how the Job Browser Pro program "g[o]t from the detailed occupational grouping number, at BLS [the Bureau of Labor Statistics], down to the individual number for ticket seller, or cashier, or rental consultant." *Id.* at 70. Yet, she also testified that, in her opinion, the numbers were accurate and had "great integrity, using this particular software." *Id.* at 69. She went on to testify:

> Those industry codes are derived from, not an algorithm or some kind of a mathematical concept, but rather through . . . employer survey[s] . . . which are considered to be much more accurate than the older math of using the census codes, which is essentially a household survey. . . . So I just wanted to add that in response to your, 'How do they get from Point A through Point B?' They do it through survey and then applying the proper industry codes.

*Id.* at 72. In adopting the vocational expert's testimony, the administrative law judge explained:

> [The vocational expert] testified that it is her professional opinion that the number of jobs available both nationally and in the State of Maine, obtained through Job Browser Pro[,] [is] accurate and [has] great integrity. [She] further testified that the above jobs are only representative and that other jobs that satisfy the hypothetical exist. The undersigned notes that in the past, Administrative Law Judges have taken administrative notice of the numbers derived from the Bureau of Labor Statistics without breaking these numbers down further. The refinement of these numbers – previously held to be reliable – through Job Browser Pro adds

---

Statement of Errors at 12-13. He then went on to state, seemingly contradictorily, that the vocational expert "testified that she does not know how the Job Browser Pro software program converts the aggregate data into specific DOT occupation job numbers." *Id.* at 13 (citation omitted). At oral argument, the plaintiff's counsel acknowledged that Job Browser Pro generates numbers for specific DOT occupations. He made clear that his client's argument is that the vocational expert assertedly relied on Job Browser Pro, rather than her experience or expertise, to derive those numbers.

14

an additional layer of accuracy, reliability and integrity to the numbers cited by [the vocational expert].

*Id*. at 20.

While the vocational expert may not have known, in precise technical detail, how the Job Browser Pro system worked, she explained why she thought that the underlying data was reliable and endorsed the numbers derived therefrom as accurate. She, thus, relied on her professional experience and expertise, and not strictly on a software program, in endorsing the numbers provided to the administrative law judge. In such circumstances, this court has held vocational testimony as to job numbers sufficiently reliable to support a Step 5 finding. *See, e.g., Woodard v. Astrue*, No. 1:10–cv–327–DBH, 2011 WL 2580641, at *5 (D. Me. June 28, 2011) (rec. dec., *aff'd* July 19, 2011) ("[I]n this case the vocational expert went on to testify that, based on her professional experience, the numbers sounded "realistic in terms of availability[,]" Record at 54–55, in other words, that she had given realistic numbers with respect to the three identified jobs.).

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **VACATED** and the case **REMANDED** for further proceedings consistent herewith.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 28th day of March, 2012.    /s/ John H. Rich III
                                        John H. Rich III
                                        United States Magistrate Judge